UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
ADRIAN ANGEVIN,

                                Plaintiff,

              -against-

CITY OF NEW YORK, WILLIAM WASSON, and JOHN                 10 CV 5327 (SLT)(SMG)
and JANE DOE 1 through 10, individually and in their official
capacities, (the names John and Jane Doe being fictitious,
as the true names are presently unknown),

                              Defendants.
--------------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


LEVENTHAL & KLEIN, LLP
*Attorneys for Plaintiff*
45 Main Street, Suite 230
Brooklyn, New York 11201
(718) 722-4100

**Table of Contents**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

SUMMARY JUDGMENT STANDARDS ......................................................................... 9

ARGUMENT ...................................................................................................................... 9

POINT I     DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT
            ON PLAINTIFF'S SECTION 1983 FALSE ARREST CLAIM ....................... 9

            A.     Because Detective Wasson Was Aware of Facts That Significantly
                   Undermined Qiana's Credibility Before He Arrested Mr. Angevin
                   There is a Genuine Dispute of Material Fact as toWhether There
                   Was Probable Cause for the Arrest ...................................................... 10

            B.     Defendants' Attempts to Explain Away Qiana's Inconsistent Accounts
                   of the Incident Are Inapposite and Many Simply Highlight the Existing
                   Dispute of Fact Regarding of Probable Cause ...................................... 13

POINT II    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON
            PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS .............................. 19

            A.     Under Prevailing Law Evidence that Detective Wasson Engaged in
                   Bad Faith Conduct That Misled ADA Katchen is Sufficient to Rebut
                   the Probable Cause Presumption Arising From the Grand Jury Indictment
                   and Support a Finding That He Initiated the Criminal Proceeding .................... 19

            B.     The Undisputed Facts Showing that Detective Wasson Failed to Inform
                   ADA Katchen About Qiana's Inconsistent Statements is Sufficient to
                   Rebut the Presumption of Probable Cause Arising From the Grand Jury
                   Indictment, Support a Finding that He Initiated the Criminal Proceeding,
                   and Provide a Basis for a Finding of Actual Malice ............................ 21

POINT III   DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT
            FOR DETECTIVE WASSON ON QUALIFIED IMMUNITY GROUNDS .................. 23

            A.     There are Genuine Disputes of Material Fact That Preclude A Finding
                   That Detective Wasson's Conduct Was Objectively Reasonable ....................... 23

CONCLUSION ................................................................................................................. 25

–i–

**Table of Authorities**

**Federal Cases**                                                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 9

*Bouche v. City of Mount Vernon*, 2012 WL 987592 (E.D.N.Y. Mar. 23, 2012) ........................ 11

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ................................................... 19, 20, 21

*Bullard v. City of New York*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) ................................... 11

*Caldarola v. Calabrese*, 298 F.3d 156 (2d Cir. 2002) ............................................................ 23

*Castrinacci v. Kirsopp*, 2012 WL 1801733 (N.D.N.Y. May 16, 2012) ...................................... 22

*Cerrone v. Brown*, 246 F.3d 194 (2d Cir. 2001) ..................................................................... 23

*Chimurenga v. City of New York*, 45 F. Supp. 2d 337 (S.D.N.Y. 1999) .................................... 20

*Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ............................................... 10, 11

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ....................................................... 11, 24

*Douglas v. City of New York*, 595 F. Supp. 2d 333 (S.D.N.Y. 2009) ..................................... 20, 22

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991) ...................................................... 23

*Gonzalez v. City of New York*, 2005 U.S. Dist. LEXIS 20645 (S.D.N.Y. Sept. 16, 2005) ........ 10

*Green v. City of New York*, 465 F.3d 65 (2006) .................................................................. 24, 25

*Jovanovic v. City of New York*, 2006 WL 2411541 (S.D.N.Y. Aug. 17, 2006) .......................... 12

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ...................................................... 23, 24

*Lerando-Phipps v. City of New York*, 390 F. Supp. 2d 372 (S.D.N.Y. 2005) ...................... 21, 22

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir.1996) ..................................................... 22

*Marin v. Viggiani*, 1993 WL 404098 (S.D.N.Y. Oct. 5, 1993) ............................................. 16, 17

*McBride v. City of New Haven*, 2000 WL 559087 (D. Conn. Mar. 30, 2000) ............................ 12

*Mistretta v. Prokesch*, 5 F. Supp. 2d 128 (E.D.N.Y. 1998) ..................................................... 11

*Pearson v. Lorancaitis*, 2012 WL 162355 (D. Conn. Jan. 19, 2012) ........................................ 11

*Peterson v. County of Nassau*, 995 F. Supp. 305 (E.D.N.Y. 1998) ........................................... 11

*Ricciutti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ....................................... 11, 20, 22

*Richards v. City of New York*, 2003 WL 21036365 (S.D.N.Y. May 7, 2003) ...................................... 12, 22

*Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) ............................................................................................ 24

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995) ..................................................................... 9

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995) ............................................................. 10, 11

*Smith v. City of New York*, 388 F. Supp. 2d 179 (S.D.N.Y. 2005) ........................................................... 10

*Torino v. Rieppel*, 2009 WL 3259429 (E.D.N.Y. Oct. 8, 2009) ................................................................ 11

*Weyandt v. Okst*, 101 F.3d 845 (2d Cir. 1996) ......................................................................................... 10

*Williams v. City of New York*, 2007 WL 2214390 (S.D.N.Y. 2007) .............................................. 20, 21, 22

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007) .................................................................................. 23

## State Cases

*Boose v. City of Rochester*, 71 A.D.2d 59 (4th Dep't 1979) ..................................................................... 15

*Broughton v State of New York*, 37 N.Y.2d 451 (1975) ............................................................................ 11

*Carlton v. Nassau County Police Dep't*, 306 A.D.2d 365 (2d Dep't 2003) ......................................... 12, 13

*Colon v. City of New York*, 60 N.Y.2d 78 (1983) ......................................................................... 19, 20, 21

*Ramos v. City of New York*, 285 A.D.2d 284 (1st Dep't 2001) ............................................................ 21, 22

*Roundtree v. City of New York*, 208 A.D.2d 407 (1st Dep't 1994) ...................................................... 12, 13

*Smith v. County of Nassau*, 34 N.Y.2d 18, 24 (1974) .............................................................................. 12

## Federal Statutes

42 U.S.C. § 1983 ...............................................................................................................................*passim*

## PRELIMINARY STATEMENT

Plaintiff Adrian Angevin ("Mr. Angevin") brings this action under 42 U.S.C § 1983 and New York state law against defendants City of New York ("City") and William Wasson to vindicate, among others, his Fourth Amendment rights to be free from false arrest and malicious prosecution. Mr. Angevin was arrested and indicted for the heinous crime of attempted rape based on the allegations of a purported victim whose lack of credibility was nothing less than glaring based on the information available to, and indeed known to, the arresting officer before the arrest. Nevertheless, the arresting officer ignored those facts that undermined the victim's credibility and arrested Mr. Angevin without probable cause, and further, he purposely misled the prosecutor on the case by failing to inform him of those facts. As a result, Mr. Angevin was indicted and incarcerated for almost two months until he was able to make bail and was then forced to deal with an ongoing criminal action for another three months before the action was dismissed on the merits on the prosecutor's recommendation. Based on the record evidence, defendants' motion seeking summary judgment dismissal of Mr. Angevin's false arrest and malicious prosecution claims should be denied because disputes of material fact pervade with respect to the elements of these claims.

In relation to the false arrest claim there is a dispute of material fact as to whether there was probable cause to arrest Mr. Angevin because at the time of his arrest defendant Wasson, the arresting officer, knew that nearly six months had elapsed since the supposed victim had reported the incident and, moreover, he was aware of facts that as an objective matter were sufficient to undermine the veracity of the purported victim's allegations and dispel any then-existing probable cause. In relation to the Section 1983 and State law malicious prosecution claims, there are disputes of material fact as to whether defendant Wasson purposely withheld from the prosecutor the existence of the facts he knew that undermined the veracity of the supposed victim's allegations and thus, whether Mr. Angevin has rebutted the presumption of probable cause arising from the grand jury's indictment of him, and whether defendant Wasson initiated the criminal proceeding against him with actual malice. Accordingly, defendants' motion for summary judgment on the false arrest and malicious prosecution claims should be denied.

## STATEMENT OF FACTS[1]

At approximately 9:00 p.m. on May 19, 2009, New York City Police Department ("NYPD")
Officer Nayron Garcia received a radio call of a crime in progress at the Staten Island Mall.  (Exhibit 1,
Deposition of NYPD Officer Nayron Garcia ("Garcia Dep.") at 10:3-11:11, 14:12-25, 23:18-24:8, 24:25-
26:9, 45:8-22, 54:3-7).  At the time, Officer Garcia and his partner, NYPD Officer Thomas McGlyn were
working out of the NYPD's 122nd Precinct in Staten Island and riding in a marked patrol car.  (*Id.* at
12:20-23, 13:8-15:19, 23:18-22, 24:25-25:10).

When they received the call, the officers were already at the Staten Island Mall.  (Ex. 1, Garcia
Dep. at 17:23-18:3, 23:21-25).  They drove a minute or two to arrive at where the caller, complainant
Qiana Beltran ("Qiana"), and her mother were waiting to speak to them.  (*Id.* at 24:2-15, 26:15-27:11,
54:15-55:4).  Once they arrived, Officer Garcia spoke to Qiana who told him that when she got off the
bus at the mall a man had followed her off the bus and was screaming at her.  (Ex. 1, Garcia Dep. at 18:3-
8, 24:20-22, 28:4-21, 30:18-31:10).  According to Qiana, the man was black, approximately twenty years
old, six-feet tall, and 180 pounds.  (*Id.* at 33:6-23 & Exhibit 2, NYPD Complaint No. 2009-122-04722
(pp. 16-18 of 18)).  She told Officer Garcia that she had no knowledge of the man's identity.  (Ex. 1,
Garcia Dep. at 33:24-35:5).

Shortly after speaking with Qiana, Officer Garcia prepared a Complaint report memorializing the
facts she reported.  (Ex. 1, Garcia Dep. at 6:15-7:7, 16:12-17:5, 21:21-22:11, 27:8-28:3, 31:16-24 & Ex.
2, NYPD Compl. No. 2009-122-04722).  The Complaint report summarized the incident as follows:  "AT
T/P/O C/V STATES UNKNOWN PERP WAS FOLLOWING HER AND SCREAMING AT HER FOR
UNKNOWN REASONS".  (Ex. 2, NYPD Compl. No. 2009-122-04722).  In the report, Officer Garcia
concluded that the facts that Qiana reported constituted the violation of Harassment.  (Ex. 1, Garcia Dep.
at 40:2-7; Ex. 2, NYPD Compl. No. 2009-122-04722).

---

[1] All exhibits referenced herein are exhibits to the Declaration of Brett H. Klein submitted herewith.

Officer Garcia's Complaint report stated only that the perpetrator in the incident had allegedly followed Qiana and screamed at her because that is all she told him about the man's behavior. (Ex. 1, Garcia Dep. at 30:18-31:9, 50:10-23).  The report did not state that the perpetrator had allegedly put a piece of clothing on part of her body, physically accosted her, or made statements of an explicitly sexual nature because Qiana did not tell Officer Garcia that the perpetrator had done those things. (*Id.* at 28:22-29:24).  If she had, he would have written them in the report and contacted his supervisor because those acts would have made out the offense of Attempted Rape. (*Id.* at 29:20-30:16).  Officer Garcia later closed out the Complaint because Qiana was unable to provide information about the perpetrator's identity. (*Id.* at 43:3-14).

At or around 7:00 p.m. on November 19, 2009 – just four days shy of six months after the incident – Qiana's mother contacted the individual defendant herein, William Wasson, who was then a detective working with the NYPD's Staten Island Special Victims Squad ("Detective Wasson").  She told Detective Wasson that Qiana had seen the man who had followed her on May 19, 2009. (Exhibit 3, Deposition of William Wasson ("Wasson Dep.") at 25:16-26:20, 39:12-40:4 & Exhibit 4, NYPD Compl.-Follow Up Inf'l Rpt. No. 1).  After receiving the call, Detective Wasson, and another detective, went to the Beltrans' home arriving at around 8:00 p.m. (Ex. 3, Wasson Dep. at 40:5-17; Exhibit 5, NYPD Compl.-Follow Up Inf'l Rpt. No. 2).

Once they arrived, Detective Wasson interviewed Qiana separately from her mother. (Ex. 3, Wasson Dep. at 40:18-41:20, 43:5-19).  In contrast to what Qiana told Officer Garcia on May 19, 2009, when Detective Wasson interviewed Qiana she told him that while she was in the parking lot of the Staten Island Mall on May 19, 2009, she was approached from behind by an unknown black male who had thrown a coat over her head, grabbed her, and stated that he wanted to "fuck her." (Ex. 3, Wasson Dep. at 40:18-41:20, 42:24-43:4; Ex. 5, NYPD Compl.-Follow Up Inf'l Rpt. No. 2).  She also told the Detective that she was able to "fight off the perpetrator who then fled in an unknown direction." (Ex. 3, Wasson Dep. at 43:20-25; Ex. 5, NYPD Compl.-Follow Up Inf'l Rpt. No. 2).  Qiana further told Detective Wasson that on the date of the incident she had reported this same information to both the 911 operator

3

when she called the police and to Officer Garcia when she spoke to him shortly thereafter.  (Ex. 3, Wasson Dep. at 72:21-73:9, 114:12-115:15 & Exhibit 6, NYPD Compl.-Follow Up Inf'l Rpt. No. 6).

Qiana informed Detective Wasson that she did not know the perpetrator's identity.  (Ex. 3, Wasson Dep. at 41:21-42:15).  She explained that she had seen him a couple of times on the bus she took to school. (Ex. 3, Wasson Dep. at 46:4-9).  Following the incident she had seen him near her home when she and her mother were walking to a bus stop and she thought he worked near her home.  (Ex. 3, Wasson Dep. at 42:16-23; Ex. 5, NYPD Compl.-Follow Up Inf'l Rpt. No. 2).

After Detective Wasson interviewed Qiana for thirty minutes or less, he interviewed her mother, Jacline Beltran.  (Ex. 3, Wasson Dep. at 48:6-11, 71:18-72:8).  Jacline Beltran told the Detective that since the incident on May 19, 2009, she would walk Qiana to the bus stop in the morning and pick her up in the afternoon.  She stated that on one occasion while they were heading to the bus stop her daughter had seen the perpetrator who "grabbed her" in the mall parking lot.  (Ex. 3, Wasson Dep. at 49:2-10, 51:2-13; Exhibit 7, NYPD Compl.-Follow Up Inf'l Rpt. No. 3).  She also informed him that she had followed the perpetrator to a building at 7 Racal Court in Staten Island and she and her husband had gone there and spoken to a manager who confirmed that individual worked there but would not give them more information.  (NYPD Compl.-Follow Up Inf'l Rpt. No. 3).

On November 16, 2009 – the day after he interviewed Qiana – Detective Wasson and another detective went to the 7 Racal Court address that Jacline Beltran said was the perpetrator's workplace. (Ex. 3, Wasson Dep. at 52:23-53:10; Exhibit 8, NYPD Compl.-Follow Up Inf'l Rpt. No. 4).  They spoke with a manager there who told them that the establishment was an assisted living facility known as Lifespire.  At the detectives' request, the manager called the employee whom she already knew they were looking for – Mr. Angevin.  (Ex. 3, Wasson Dep. at 53:11-18, 75:2-9; Ex. 8, NYPD Compl.-Follow Up Inf'l Rpt. No. 4).

When the manager got Mr. Angevin on the phone, Mr. Angevin told her to confirm with the detectives that he would meet with them at his home at 75 Trantor Place in Staten Island.  (Ex. 3, Wasson Dep. at 53:19-24; Ex. 8, NYPD Compl.-Follow Up Inf'l Rpt. No. 4).   A short time later, the detectives

4

met Mr. Angevin at his home at 75 Trantor Place and had a brief conversation with him in front.  Mr.

Angevin was cooperative and concerned, and he agreed to meet with the detectives later at their office.

(Ex. 3, Wasson Dep. at 53:25-55:24, 56:9-18; Ex. 8, NYPD Compl.-Follow Up Inform'l Rpt. No. 4).

        Later that same day, voluntarily and unaccompanied by police officers, Mr. Angevin arrived at

the detectives' office and was Mirandized and interviewed by Detective Wasson.  (Ex. 3, Wasson Dep. at

55:9-18, 68:6-13, 122:22-123:4; Exhibit 9, NYPD Compl.-Follow Up Inf'l Rpt. No. 5).  Mr. Angevin told

Detective Wasson that he had worked for Lifespire for eight years.  (Ex. 3, Wasson Dep. at 85:25-86:19

& Exhibit 10, Stmt. of A. Angevin, dated Nov. 16, 2009 (Pl's Ex. 5)).  He explained that the

complainant's parents had come to Lifespire and told one of his managers that he was involved in an

incident with their daughter at the Staten Island Mall.  He further explained that he was not at work at the

time and the manager had called to tell him about their presence, but when he arrived they were gone.

(Ex. 3, Wasson Dep. at 68:19-69:7 & Ex. 9, NYPD Compl.-Follow Up Inf'l Rpt. No. 5; Ex. 3, Wasson

Dep. at 85:25-86:19 & Ex. 10, Stmt. of A. Angevin;  Ex. 3, Wasson Dep. at 86:20-87:3 & Exhibit 11,

*People v. Angevin*, Ind. No. 337/2009 (N.Y. Sup. Ct. Richmond County) ("*People v. Angevin*"), Supplmt.

to Vol. Discl. ¶A.1 (Pl's Ex. 6)).

        Mr. Angevin stated that a few days later he saw the complainant's father across the street and

spoke to him about the incident and he thought the matter was resolved.  More recently, he said, he saw a

girl in a check cashing store who was staring at him; the girl's mother had later come to Lifespire

inquiring about him; and thereafter the detectives arrived at Lifespire wanting to speak with him.  He also

explained that the complainant had to be the "girl with big eyes" who he was familiar with from the bus

he rode and who always stared at him.  (Ex. 3, Wasson Dep. at 70:5-24 & Ex. 9, NYPD Compl.-Follow

Up Inf'l Rpt. No. 5; Ex. 3, Wasson Dep. at 85:25-86:19 & Ex. 10, Stmt. of A. Angevin;  Ex. 3, Wasson

Dep. at 86:20-87:3 & Ex. 11, *People v. Angevin*, Supplmt. to Vol. Discl. ¶A.1).  Immediately after he

interviewed Mr. Angevin on November 16, 2009, Detective Wasson arrested him and charged him with

Attempted Rape in the First Degree.  (Ex. 3, Wasson Dep. at 55:11-56:18 & Ex. 9, NYPD Compl.-Follow

Up Inf'l Rpt. No. 5).  Detective Wasson concluded that he had probable cause to arrest Mr. Angevin for

Attempted Rape based solely on the statements Qiana made to him the previous day that the perpetrator had allegedly thrown a coat over her head or stated that he wanted to "fuck" her.  (*Id*. at 56:22-57:25; 62:15-64:12; 67:12-18; 72:9-20; 82:22-83:17).

When Detective Wasson arrested Mr. Angevin he was aware of the Complaint report that Officer Garcia had prepared on May 19, 2009.  (Ex. 3, Wasson Dep. at 57:6-20, 60:20-61:13; Ex. 2, NYPD Compl. No. 2009-122-04722).  The facts summarized in the report did not constitute the offense of Attempted Rape.  At most, they made out the violation of Harassment.  (Ex. 3, Wasson Dep. at 61:22-62:10).  Officer Garcia's Complaint report was inconsistent with the facts Qiana told Detective Wasson about the incident because the report did not indicate that the perpetrator threw a coat over Qiana's head or stated that he wanted to "fuck" her.  (*Id*. at 62:15-24).

If on the date of the incident Qiana had told Officer Garcia and the 911 Operator that the perpetrator threw a coat over her head and stated he wanted to "fuck" her, those facts would have been memorialized in the Complaint report and in the NYPD Sprint report summarizing Qiana's phone call to the 911 operator.  (Ex. 3, Wasson Dep. at 78:23-80:4, 114:12-115:15).  When Detective Wasson arrested Mr. Angevin on November 16, 2009, he knew that the version of the incident that Qiana told him, which included those facts, was inconsistent with what she had apparently told Officer Garcia.  (*Id*. at 63:7-64:12).  Notwithstanding that the inconsistency implicated the material facts on which he based his conclusion that he had probable cause, the Detective deemed the inconsistency irrelevant to his probable cause analysis and entirely ignored it.  (*Id*. 60:20-64:20, 116:24-122:21).

Detective Wasson could have contacted Officer Garcia by phone or by visiting the 122nd Precinct where the Officer worked, roughly fifteen minutes from his office, to find out whether Qiana had told the Officer facts about the incident beyond those recorded in his report.  (Ex. 3, Wasson Dep. at 93:8-94:16, 124:8-17).  He also could have obtained a copy of the Sprint report summarizing Qiana's call to the 911 operator by simply pulling it up from an NYPD database on his computer to find out how she had first described the incident.  (*Id*. at 123:19-124:7).  The Sprint report was eventually obtained by the Richmond County District Attorney's Office, and it indicated that Qiana did not tell the 911 operator that

6

the perpetrator thrown a jacket over her head or stated that he wanted to "fuck" her.  (Ex. 3, Wasson Dep. at 80:6-18; Exhibit 12, Sprint Report dated May 16, 2009 (Pl's Ex. 4)).  During his deposition in this action, Detective Wasson conceded that he should have spoken to Officer Garcia and obtained a copy of the Sprint report before he arrested Mr. Angevin.  (Ex. 3, Wasson Dep. at 114:12-120:9).

Within an hour of arresting Mr. Angevin on November 16, 2009, Detective Wasson met with Assistant District Attorney ("ADA") Anthony Katchen of the District Attorney's Office to discuss the case.  (Ex. 3, Wasson Dep. at 88:16-89:5).  During the meeting he told ADA Katchen about his investigation and arrest of Mr. Angevin, and in particular, about his interview with Qiana and her mother the previous day.  (*Id.* at 89:13-16).  Although at that time the Detective knew that on May 19, 2009, Qiana had likely given Officer Garcia a description of the incident that was critically inconsistent with the facts that she told him about it the previous day, the Detective failed to inform the ADA of the inconsistency.  (*Id.* at 90:24-91:16, 92:12-95:12, 134:24-137:14).  Instead, Detective Wasson only "brought to [ADA Katchen's] attention that the original [Complaint report prepared by Officer Garcia] was made for harassment.  That was it."  (*Id.* at 136:17-137:14).  In response, ADA Katchen indicated that he was going to look into why the Complaint report indicated that the facts of the incident amounted only to the violation of Harassment.  (Ex. 3, Wasson Dep. at 90:24-95:20; 92:9-17, 135:10-17).

The following day, November 17, 2009, Mr. Angevin was indicted by a Grand Jury in State Supreme Court and charged under Indictment No. 337/2009, with Attempted Rape in the First Degree, Attempted Kidnapping in the Second Degree, Stalking in the Third Degree, and Endangering the Welfare of Child.  (Exhibit 13, *People v. Angevin*, Indictment No. 337/2009, filed Nov. 18, 2009).  The case was presented directly to a Grand Jury without the filing of an accusatory instrument.  (Exhibit 14, *People v. Angevin*, Affidavit of ADA Anthony L. Katchen in Recommendation of Dismissal, dated Apr. 28, 2010 ("Dismissal Recomm.") ¶10 n. 2 (Pl's Ex. 7)).

Mr. Angevin was arraigned on the indictment the next day, November 18, 2009.  Bail was set at $250,000.  (Ex. 14, Dismissal Recomm. ¶11).  Thereafter, Mr. Angevin remained incarcerated at Rikers Island until January 7, 2010, when he was able to post bail.  (*Id.*).  After he was released, he was

compelled to appear in State Court on approximately six dates before the criminal action was dismissed

on April 28, 2010, pursuant to a Recommendation for Dismissal filed by ADA Katchen. (Exhibit 15,

*People v. Angevin*, Case Calendar).

Following Mr. Angevin's arraignment, ADA Katchen and other representatives of the District

Attorney's office conducted an investigation into the credibility of Qiana Beltran's allegations. (Ex. 14,

Dismissal Recomm. ¶¶12-20). Among other things, two days after Mr. Angevin was arraigned, ADA

Katchen interviewed Officer Garcia. (*Id.* ¶14). Officer Garcia explained to the ADA that if Qiana

Beltran had told him back on May 19, 2009, that she had been grabbed in the parking lot of the mall and

had a jacket thrown over her head, he would have recorded those details in his Complaint report. (*Id.*).

ADA Katchen understood at the time that the Officer's recollection as to what Qiana had told him

contradicted what she told Detective Wasson about having reported those facts to both the 911 operator

and the Officer on the date of the incident. (*Id.*)

In addition, the District Attorney's Office contacted the NYPD Communications Division and

requested a copy of the recording of Qiana's call to the 911 operator on the date of the incident. (Ex. 14,

Dismissal Recomm. ¶15). Although by that time the recording had been erased pursuant to NYPD

protocols because over six months had elapsed since the incident, the Office was able to obtain a copy of

the Sprint report for the 911 call. (*Id.*) Upon reviewing the Sprint report ADA Katchen found that it did

not contain any reference to Qiana having told the 911 operator that the perpetrator had physical contact

with her. (*Id.*) ADA Katchen understood that this contradicted what Qiana had told Detective Wasson

(Ex. 3, Wasson Dep. at 42:24-43:25) and what she also told him about the perpetrator having physically

accosted her. (Ex. 14, Dismissal Recomm. ¶15).

On February 9, 2010, the District Attorney's Office subpoenaed records from the City's

Department of Education concerning Qiana's attendance and academic performance at the public school

she attended in Staten Island. (Ex. 14, Dismissal Recomm. ¶16). The records revealed that, among other

things, she had not been issued a student Metrocard for the term beginning September 2008, and during

the 2008-2009 school year she attended for only twenty-seven days, or until November 14, 2008. (*Id.*)

This contradicted her allegations that on more than twenty-five occasions between September and May 2008, while she was on the bus on her way to school, Mr. Angevin had stared at her and engaged in making obscene facial and verbal expressions to her. (*Id.* ¶¶5, 16).

On May 31, 2010, ADA Katchen interviewed Qiana and her mother and confronted them with the inconsistencies between Qiana's representations about the incident, and the NYPD records, the Metrocard records, and the Department of Education records. (Ex. 14, Dismissal Recomm. ¶18). When neither could provide plausible explanations for the discrepancies, ADA Katchen concluded that Qiana's credibility was severely undermined by the available evidence and the People would not be able to prove their case against Mr. Angevin beyond a reasonable doubt. (*Id.* ¶¶19-22). Accordingly, he submitted a Recommendation for Dismissal of the action. (*Id.*). The State Supreme Court heeded the recommendation, dismissed the action, and sealed the record pursuant to N.Y. Criminal Procedure Law § 160.50. (Ex. 15, *People v. Angevin*, Case Calendar).

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court must examine the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all factual inferences in favor of the non-moving party. *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). The burden is on the moving party to show that the evidence is such that a reasonable jury could not return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### POINT I

#### DISPUTES OF MATERIAL FACT PRECLUDES
#### SUMMARY JUDGMENT ON PLAINTIFF'S SECTION 1983 FALSE ARREST CLAIM

To prove a claim for false arrest under Section 1983, a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was aware of the confinement; (3) the confinement was

without the plaintiff's consent; and (4) the confinement was not otherwise privileged. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Defendants correctly note that probable cause to arrest is a complete defense to a false arrest claim. Defs.' Mem. at 3; *Weyandt v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). They argue that summary judgment is proper on the false arrest claim because Detective Wasson had probable cause to arrest Mr. Angevin. Defs.' Mem. at 5. Contrary to defendants' argument there are genuine disputes of material fact as to whether Qiana's delay in reporting the alleged crime coupled with her inconsistent statements about it undermined the credibility of her allegations to an extent that was objectively sufficient to dispel any then-existing probable cause Detective Wasson had to arrest Mr. Angevin. Defendants' motion for summary judgment on this claim must therefore be denied.

A.    Because Detective Wasson Was Aware of Facts That Significantly Undermined Qiana's Credibility Before He Arrested Mr. Angevin There is a Genuine Dispute of Material Fact as to <u>Whether There Was Probable Cause for the Arrest</u>

In support of their argument on the false arrest claim, defendants rattle off a litany of indisputable black letter propositions concerning probable cause. For example, defendants assert, and Mr. Angevin agrees, that identification of an alleged perpetrator "'by a purported victim of the crime will generally suffice to establish probable cause.'" Defs.' Mem. at 4 (quoting *Gonzalez v. City of New York*, 2005 U.S. Dist. LEXIS 20645, *14 (S.D.N.Y. Sept. 16, 2005) and citing *Smith v. City of New York*, 388 F. Supp. 2d 179, 185 (S.D.N.Y. 2005)). Similarly, as Mr. Angevin does not dispute, a police officer has probable cause to arrest when he receives information from a purported crime victim "'who it seems reasonable to believe is telling the truth.'" *Id.* (quoting *Gonzalez*, 2005 U.S. Dist. LEXIS 20645, at *14). As defendants also note, once a police officer has a reasonable basis for believing that probable cause exists, "'he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest'" and it "'does [not] matter that an investigation might have cast doubt upon the arrest.'" Defs.' Mem. at 4 (quoting, respectively, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) and *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)). However, in delivering this exposition defendants give short shrift to several unassailable legal propositions concerning probable cause that are critical to why their motion on the false arrest claim must be denied.

10

First, they fail to acknowledge that in the context of a false arrest claim, when the arrest was executed without a warrant – as it was here – there is a presumption that it was unlawful and defendants bear the burden of demonstrating that it was supported by probable cause. *E.g.*, *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003); *Broughton v State of New York*, 37 N.Y.2d 451, 459 (1975). Second, the issue of whether or not probable cause existed for an arrest depends on the information that was available to the arresting officer at the time of the arrest. *Torino v. Rieppel*, 2009 WL 3259429, *3 (E.D.N.Y. Oct. 8, 2009); *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998). Third, as the Second Circuit has repeatedly noted: "An arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest *absent circumstances that raise doubts as to the victim's veracity*." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (emphasis supplied); *also Curley*, 268 F.3d at 70 ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity.") (internal citation omitted).

Of course there are myriad factual circumstances can create doubts about the veracity of a putative victim's allegations. For example, it is well settled that an extended delay by the putative victim in reporting the alleged crime is relevant in evaluating the credibility of his or her allegations and hence the existence of probable cause. *Bouche v. City of Mount Vernon*, 2012 WL 987592, *4 & n. 44 (S.D.N.Y. Mar. 23, 2012) ("A victim's delay in reporting a crime may also be a factor in evaluating the victim's credibility and the assessment of probable cause."); *Torino*, 2009 WL 3259429, at *5; *Bullard v. City of New York*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003). Likewise, a prior relationship between the purported victim and the alleged perpetrator that would provide a motivation for false accusation is relevant in determining the victim's credibility and thus the existence of probable cause. *Pearson v. Lorancaitis*, 2012 WL 162355, *9 (D. Conn. Jan. 19, 2012); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). Yet another circumstance that gives rise to questions about the veracity of a complainant's allegations and hence the existence of probable cause is when a key eyewitness provides inconsistent statements about the perpetrator's conduct or identity. *Bouche v. City of Mount Vernon*, 2012

11

WL 987592, *6 (S.D.N.Y. Mar. 23, 2012) (denying motion to dismiss false arrest claim based on plaintiff's allegation that eyewitness gave police conflicting statements regarding plaintiff's participation in crime); *Smith v. County of Nassau*, 34 N.Y.2d 18, 24 (1974) (reversing summary judgment on false arrest where victim's conflicting identifications created issue of fact as to whether officer reasonably relied on his observations for probable cause to arrest); *Richards v. City of New York*, 2003 WL 21036365, *17 (S.D.N.Y. May 7, 2003) (denying summary on false arrest claim because conflicting statement of key eyewitness created fact issue as to existence of probable cause to arrest).

Fourth, and finally, if law enforcement officers are aware of circumstances demonstrating that a purported victim's allegations may not be credible, and therefore probable cause may not exist, they cannot just ignore those facts and arrest the suspect. Rather they must conduct further investigation to corroborate the truth of the complainant's allegations. *Jovanovic v. City of New York*, 2006 WL 2411541, *7 (S.D.N.Y. Aug. 17, 2006) (holding that when circumstances raise questions about purported victim's credibility "[an] officer has a duty to assess the reliability of the victim and ... to investigate the allegations and corroborate them," before they can provide basis for probable cause); *McBride v. City of New Haven*, 2000 WL 559087, *11-12 (D. Conn. Mar. 30, 2000) (where veracity of victim's statements were called into question defendant officers had a duty to "do more" to corroborate their truth). When law enforcement officers ignore such facts they do so at their peril in terms of the risk of civil liability for false arrest. *Carlton v. Nassau County Police Dep't*, 306 A.D.2d 365, 366 (2d Dep't 2003) (denying summary judgment where facts undermined veracity of complainant's allegations of theft of services: "[T]he failure to make further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."); *Roundtree v. City of New York*, 208 A.D.2d 407, 407 (1st Dep't 1994) (denying summary judgment where officer lacked probable cause given unreliability of witness statement that was "undisputedly the impetus for plaintiff's arrest" and failed to perform further investigation).

In this case, when Detective Wasson arrested Mr. Angevin on November 16, 2009, he knew that nearly six months had elapsed since the incident. Ex. 3, Wasson Dep. 57:6-20, 60:20-61:13. He also knew that Qiana had told him a version of the incident that conflicted with what she had apparently told

12

Officer Garcia six months earlier, because the version she apparently told the Officer did not include the critical facts on which he based his conclusion that he had probable cause to arrest. *Id.* at 61:5-64:12.

Further, the record demonstrates that the Detective could have easily undertaken at least two additional investigative steps that would have confirmed the unreliability of Qiana's allegations. He could have conferred with Officer Garcia by phone or by visiting the 122nd Precinct, located fifteen minutes from his office. Ex. 3, Wasson Dep. at 93:8-94:16, 124:8-17. He also could have obtained the Sprint report that summarized the substance of Qiana's call to the 911 operator by simply pulling it up on his office computer from an NYPD database. *Id.* at 123:19-124:7. The Detective did not complete either of those tasks notwithstanding that if on the date of the incident Qiana had told the 911 Operator and Officer Garcia the facts about it that she told him, which he relied upon for probable cause, they would have been memorialized in the Sprint report and the Complaint report. *Id.* at 114:12-115:15.

Viewing the evidence in the light most favorable to Mr. Angevin and drawing all reasonable inferences in his favor, a jury could find that Qiana's nearly six-month delay in reporting the facts constituting the alleged crime coupled with the inconsistency between her initial description of it to Officer Garcia and what she later told Detective Wasson about it, all of which was known to Detective Wasson prior to the arrest, undermined her credibility to an extent that was objectively sufficient to dispel any then-existing probable cause the Detective had to arrest Mr. Angevin. Stated otherwise, reasonable jurors could find that when faced with the facts about Qiana Beltran's delay in reporting the alleged crime and the inconsistency of her allegations, which were known to Detective Wasson before the arrest, a reasonable officer in his position would have inquired further into the veracity of her allegations and his failure to do so demonstrates a lack of probable cause. *Carlton*, 306 A.D.2d at 366; *Roundtree*, 208 A.D.2d at 407. Accordingly, summary judgment is improper on the false arrest claim.

B.   Defendants' Attempts to Explain Away Qiana's Inconsistent Accounts of the Incident Are
     Inapposite and Many Simply Highlight the Existing Dispute of Fact Regarding of Probable Cause

Defendants make several concerted attempts to obliquely explain away the inconsistency between Qiana's initial description of the alleged crime and her later statements to Detective Wasson in order to

sidestep the fact dispute the inconsistency raises and its implication for probable cause.  Defendants begin by glibly asserting that Mr. Angevin "purports to claim that the omission of certain details from [Officer Garcia's] May 19, 2009 [C]omplaint report [] would indicate that [Qiana] failed to mention these details to [Officer Garcia] on May 19, 2009."  Defs.' Mem. at 6.

    Mr. Angevin does not merely "purport to claim" that the absence of "certain details" from Officer Garcia's Complaint report, "would" indicate that she "failed to mention those details."  Defs. Mem. at 6. Rather, a central factual premise of Mr. Angevin's argument is that the absence from Officer Garcia's Complaint report of the critical facts Qiana told Detective Wasson six months later – specifically, her representations that the perpetrator threw a jacket over her head and made an explicit sexual statement to her – that provided the sole basis for the Detective's conclusion that he had probable cause, unquestionably indicated to him, or any reasonable officer in his position, that she did not report those facts to Officer Garcia on the date of the incident.  Viewing the evidence in the light most favorable to Mr. Angevin and drawing all reasonable inferences in his favor, a jury could find that this fact proposition to be established based on the record evidence.

    Plaintiff's next argue that "even assuming that such an omission would be relevant to the assessment of [Qiana]'s credibility, the record [] demonstrates that [she] claimed to have originally told Officer Garcia a story consistent with the statements she made [about the incident] to [Detective Wasson]."  Defs. Mem. at 6.  It appears that the main thrust of this argument[2] is that when Qiana told the Detective on November 16, 2009, that she had already told Officer Garcia the same facts she was then telling him, it eradicated any doubts he could have harbored about the truth of her allegations and made her a credible complainant as a matter of law.

    This argument is unpersuasive because the inferences to be drawn from the fact that Qiana made that representation are at best equivocal and only highlight the outstanding fact dispute on probable cause. On the one hand, the fact that Qiana told Detective Wasson that she had reported the same facts to Officer

_____

[2] No serious response is warranted to the initial, "even assuming" clause of this argument which astoundingly implies that Qiana's prior inconsistent statement about the incident was irrelevant to an assessment of her credibility.

Garcia that she was then telling him could have been viewed by the Detective as evidence that the Officer's Complaint report was incomplete. On the other hand it could just as well have been viewed by the Detective as evidence that Qiana was purposely backtracking and seeking to cover up the fact that she had not told Officer Garcia the critical facts that she was then telling him.

On this motion, the latter inference must be drawn since the evidence must be viewed in the light most favorable to Mr. Angevin. The question of which factual inference should ultimately be drawn and its implications for Detective Wasson's or any reasonable police officer's assessment of Qiana Beltran's credibility and hence the existence *vel non* of probable cause is a quintessential jury issue.

Defendants next argue that because, as Detective Wasson explained in his deposition, "things [sometimes] get misconstrued between the complaint and the police officer" when the officer prepares the "initial report" it was reasonable for the Detective to credit the version of events Qiana told him instead of the Complaint report that was possibly mistaken. Defs. Mem. at 6 (internal quotation marks omitted). Once again, this argument highlights the outstanding fact dispute concerning probable cause.

Assuming, without conceding, that the information that complaining witnesses provide to police officers sometimes gets misconstrued when the officers fill out complaint reports, then it is also true that in some instances the information does not get misconstrued. In this case, Detective Wasson simply assumed that the information Qiana initially provided to Officer Garcia was misconstrued in his Complaint report of May 19, 2009. Whether it was reasonable for the Detective to engage that assumption and credit the facts Qiana told him about the incident instead of viewing the report as critically inconsistent with what she told him – thus substantially undermining her credibility and vitiating probable cause – is a quintessential fact issue for jury resolution. Viewing the evidence in the light most favorable to Mr. Angevin and drawing all reasonable inferences in his favor, the latter proposition must be credited and the Detective's assumption that Qiana's information was "misconstrued" must be deemed unreasonable. *Boose v. City of Rochester*, 71 A.D.2d 59, 68-69 (4th Dep't 1979) (officer's assumption that plaintiff was perpetrator in another incident based on inconsistent information in a report issued by

another officer created an issue of fact as to whether the officer had reasonably concluded he had probable cause to arrest without further investigation or inquiry).

Defendants further argue that notwithstanding the credibility issues created by the inconsistency between Qiana's description of the incident to Officer Garcia and her later statement to Detective Wasson, the Detective was "entitled" to credit the account Qiana told him after he learned that "she had correctly described [Mr. Angevin] as someone who rode her bus" – a fact Mr. Angevin told the Detective when he was interviewed on November 16, 2009. Defs.' Mem. at 7. This argument is a remarkable exercise in sophistry.

Defendants' provide no authority for the proposition that an officer's independent corroboration of an immaterial fact at this level of generality constitutes sufficient corroboration of a complainant's allegations to support probable cause. The single case that defendants cite for the proposition that independent corroboration can support probable cause sets forth a far more stringent substantive standard.

Specifically, defendants quote *Marin v. Viggiani*, 1993 WL 404098, *6 (S.D.N.Y. Oct. 5, 1993), for the proposition that "'when a victim *precisely identifies* the alleged perpetrator of a crime and there is independent corroborative evidence to support *at least some* of the victim's assertions, a person of reasonable caution is warranted in believing that an offense has been committed by the alleged perpetrator.'" Defs.' Mem. at p. 7 (quoting *Marin*, 1993 WL 404098, at *6) (first emphasis supplied, second by defendants). The standard in *Marin* thus requires that the victim "precisely" identify the alleged perpetrator. Here, it is undisputed that Qiana was entirely unable to do so. Ex. 1, Garcia Dep. at 33:24-35:5; Ex. 3, Wasson Dep. at 41:21-42:15. Further, the standard requires that there be corroboration of "at least some" of the putative victim's assertions. *Marin*, 1993 WL 404098, at *6. "Some" means more than one and yet defendants' rely on corroboration of just one assertion by Qiana about having been on a bus with the alleged perpetrator.

Third, the *Marin* court's own application of the standard – which it formulated based on settled rules regarding the existence of probable cause founded on information from informants and anonymous tipsters – demonstrates that the standard does not contemplate that sufficient corroboration is supplied by

16

corroborating an immaterial fact at the level of generality defendants have proffered.  *Marin*, 1993 WL 404098, at *6.  In *Marin*, the court found that there was independent corroboration of the victim's allegations sufficient to provide probable cause where the victim filed a formal complaint with police specifically identifying the defendant as the perpetrator of an assault and also provided the police with a hospital record detailing her treatment for injuries consistent with the alleged assault.  *Id.*

Here defendants have offered no evidence of independent corroboration of any of Qiana's allegations that are material to the criminal conduct she alleged by Mr. Angevin.  Defendants might as well have also advanced the fact that Qiana and Mr. Angevin both lived on Staten Island as independent corroboration since that fact is only incrementally less coincidental than their both riding on a bus there.

Fourth, the supposed corroboration defendants advance here is particularly inapt in light of the doubts about the veracity of Qiana's allegations – created by her own inconsistent statements about the incident and her delay in reporting it – that the corroboration is offered to dispel.  Defendants' claim of independent corroboration based on Qiana and Mr. Angevin having ridden on the same bus is just as consistent with an inference that Qiana used this benign coincidence of proximity to Mr. Angevin as a basis for falsifying her allegations as it is consistent with the proposition that her allegations were true.

Finally, defendants argue that "even if one assumes" that Qiana's initial description of the incident to Officer Garcia "omitted" the critical facts that she told Detective Wasson six months later,[3] the embarrassing nature of the incident and her fear for her safety provided plausible explanations for the inconsistency and her delay in providing a full account.  Defs.' Mem. at 7.  Once again, this argument ultimately highlights the existing dispute of material fact on probable cause.

Both of the "plausible explanations" defendants proffer for Qiana's inconsistent statements and her delay in providing a full account of the incident are in conflict with what she told Detective Wasson about what she reported to the police on the date of the incident.  Based on this conflict, defendants'

---

[3] Contrary to defendants' assertion, the Court need not "assume" that Qiana failed to report these critical facts in her initial description of the incident to Officer Garcia because based on the record evidence it is an undisputed fact that she failed to do so.  Ex. 1, Garcia Dep. at 28:22-31:9, 50:10-23.

proffered explanations would have been entirely implausible to Detective Wasson or any reasonable

police officer, or they support Mr. Angevin's position that prior to his arrest the Detective was aware of

facts that raised doubts about the veracity of Qiana's allegations that were objectively sufficient to

eliminate any probable cause to arrest.

It is undisputed that when Detective Wasson interviewed Qiana on November 16, 2009, she told

him that on the date of the incident she had reported to the 911 operator and Officer Garcia the same facts

about the incident that she was then telling him. Ex. 3, Wasson Dep. at 114:12-115:15.  If Detective

Wasson or any reasonable police officer in his position perceived that Qiana was telling the truth when

she stated that fact proposition then he or she would have found both of the supposedly plausible

explanations defendants have advanced here entirely implausible.  Specifically, if the Detective or a

hypothetical reasonable officer thought that Qiana was being truthful about having given a full account to

the 911 operator and Officer Garcia on the date of the incident then there would be no basis for him or her

to believe that Qiana was too embarrassed or fearful for her safety to provide a full account at that time.

Indeed, during his deposition in this action, Detective Wasson admitted that this scenario is in fact what

occurred. Ex. 3, Wasson Dep. at 114:12-116:4.

Another possibility is that Detective Wasson, or any reasonable police officer, could have

perceived Qiana as lying about having told the 911 operator and Officer Garcia the same facts she was

then telling him or her.  If that was the case, then it is plausible that Qiana's lie raised doubts about the

veracity of her allegations that were objectively sufficient to eliminate any probable cause the Detective

had to arrest.  A third possibility is that the Detective or any reasonable officer would have perceived

Qiana as mistaken when she stated that on the date of the incident she had told the police the same facts

that she was then telling him.

On this motion, the Court should not decide which inference should be drawn regarding how

Detective Wasson or any reasonable officer in his position would have perceived what Qiana told him

because it is a quintessential fact matter for jury resolution.  Viewing the evidence in the light most

favorable to Mr. Angevin and drawing all reasonable inferences in his favor, a jury could find that the

Detective should have perceived Qiana as lying about having told the 911 operator and Officer Garcia the same facts that she told him and that as an objective matter Qiana's lie raised sufficient doubts about the veracity of her allegations to dispel any probable the Detective may have had to arrest Mr. Angevin.[4]

**POINT II**

**DISPUTES OF MATERIAL FACT PRECLUDE
SUMMARY JUDGMENT ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS**

To prevail on his malicious prosecution claims under Section 1983 and New York law, Mr. Angevin must show:  (1) the initiation of a criminal proceeding against him; (2) termination of the proceeding in his favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice. *E.g.*, *Boyd v. City of New York*, 336 F.3d 72, 75-76 (2d Cir. 2003) ("The elements of . . . malicious prosecution under § 1983 are 'substantially the same' as the elements under New York law [and] [t]herefore, the analysis of the state and the federal claims is identical.") (citation omitted).  Defendants assert that the claims should be dismissed because Mr. Angevin cannot prove the first, third, and fourth elements.  Contrary to defendants' assertions, when the correct legal principles are applied, viewing the evidence in the light most favorable to Mr. Angevin, a jury could find that Detective Wasson initiated the criminal action against him, and that it was commenced without probable cause and with actual malice.

A.  Under Prevailing Law Evidence that Detective Wasson Engaged in Bad Faith Conduct That Misled ADA Katchen Sufficient to Rebut the Probable Cause Presumption Arising From the Grand Jury Indictment and Support a Finding That He Initiated the Criminal Proceeding

In a malicious prosecution action probable cause consists of "'facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.'"  *Boyd*, 336 F.3d at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).  Defendants correctly note (Defs.' Mem. at 10) that a grand jury indictment creates a presumption of probable cause that can be rebutted only by

---

[4] Mr. Angevin's arguments in this Point I apply with equal force to defendants' claim that probable cause existed to arrest him for Harassment based on the description of the incident in Officer Garcia's Complaint report. Defs.' Mem at p. 6 n.1.  In sum, viewing the evidence in the light most favorable to Mr. Angevin, a jury could find that Qiana's inconsistent statements about the incident, her delay in reporting the facts that constituted the crime of Attempted Rape, and her lying to Detective Wasson about having told the Officer Garcia the same facts that she told him raised doubts about her veracity sufficient to eliminate probable cause to arrest Mr. Angevin for any crime at all, including any crime based on the facts Qiana reported to Officer Garcia.

19

showing that "'the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Boyd*, 336 F.3d at 76 (quoting *Colon*, 60 N.Y.2d at 83). More particularly, when the conduct of arresting or investigating police officers is at issue, the presumption is overcome by evidence showing that the officers "have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Colon*, 60 N.Y.2d at 82-83; *also Boyd*, 336 F.3d at 76.

Further, the first element of a malicious prosecution claim – initiation of the criminal proceeding – may be satisfied with respect to an arresting officer by the same evidence that is sufficient to rebut the probable cause presumption. Thus, where the claim is against an arresting officer after a warrantless arrest and grand jury indictment, to the extent the evidence demonstrates that the officer was involved in advancing the prosecution through any of the forms of misconduct sufficient to rebut the probable cause presumption, that evidence is also sufficient to find that the officer initiated the proceeding. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir.1997) (officer initiated criminal proceeding where he did "not directly file [ ]" the charges, but played an "instrumental" role by forwarding false information to prosecutors); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) (holding that where undisputed facts showed "none of the [officers] issued the criminal complaint . . . or determined what the criminal charges . . . would be" a jury could find that the officers initiated proceeding to the extent they engaged in conduct that would rebut probable cause presumption); *Williams v. City of New York*, 2007 WL 2214390, *11 (S.D.N.Y. 2007) (causal chain between officers' conduct and ADA's decision to commence prosecution was not broken where officers provided false information to a third officer who processed arrest: "A police officer can be held to have initiated a prosecution by failing to provide material information to an investigation or prosecution which influences the decision to prosecute."); *also Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999). This is true notwithstanding that the officers did not otherwise initiate the prosecution via one of the typically legally cognizable means of doing so, *i.e.*, by filing a formal complaint or signing affidavits in support thereof. *Douglas*,

20

595 F. Supp. 2d at 342; *Williams*, 2007 WL 2214390, at *6; *also Lerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005).

B.    The Undisputed Facts Showing that Detective Wasson Failed to Inform ADA Katchen About Qiana's Inconsistent Statements is Sufficient to Rebut the Presumption of Probable Cause Arising From the Grand Jury Indictment, Support a Finding that He Initiated the Criminal Proceeding, <u>and Provide a Basis for a Finding of Actual Malice</u>

In the instant action, it is undisputed that on November 16, 2006, shortly after Detective Wasson arrested Mr. Angevin, he met with ADA Anthony Katchen to discuss the case. Ex. 3, Wasson Dep. at 88:16-89:5. The undisputed evidence also demonstrates that when Detective Wasson met with ADA Katchen he did not inform the ADA that on the date of the incident Qiana had apparently failed to report to Officer Garcia the critical facts that she told him that were the basis of his conclusion that he had probable cause to arrest and charge Mr. Angevin. *Id.* at 90:24-91:16, 92:12-95:12, 134:24-137:14. Rather than alerting ADA Katchen to this very significant discrepancy, the Detective did nothing more than indicate to the ADA that a Complaint report had been prepared on the date of the incident. *Id.* at 136:25-137:14. Obviously, this was far from a complete and full disclosure of the pertinent facts that was required from the Detective as a matter of law. *Colon*, 60 N.Y.2d at 82-83; *also Boyd*, 336 F.3d at 76.

Viewing this evidence in the light most favorable to Mr. Angevin and drawing all reasonable inferences in his favor, a jury could find Detective Wasson purposefully misled ADA Katchen by suppressing the fact that on the date of the incident Qiana apparently did not report to Officer Garcia the critical facts that served as the basis for his conclusion that he had probable cause to arrest Mr. Angevin. A jury could further find that this evidence is sufficient to rebut the presumption of probable cause and constitutes sufficient involvement in and advancement of the prosecution to warrant a finding that he initiated the proceeding against Mr. Angevin. *Ramos v. City of New York*, 285 A.D.2d 284, 298-300 (1st Dep't 2001) (holding jury could find that City agency's withholding of report from the prosecutor showing child rape victim's symptoms were inconsistent with her allegations was sufficient to rebut presumption of probable cause and deem agency initiator of criminal proceeding).

Further as to the element of actual malice, it is well settled that actual malice may be inferred from the absence of probable cause. *E.g.*, *Ricciuti*, 124 F.3d at 131; *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir.1996); *Douglas*, 595 F. Supp. 2d at 342; *Williams*, 2007 WL 2214390, at *6; *Lerando-Phipps*, 390 F. Supp. 2d at 383.  In addition, as discussed in Point I above, a dispute of material fact remains as to whether Detective Wasson had probable cause to arrest Mr. Angevin which precludes summary judgment on the false arrest claim.  *Supra*, Point I.  Summary judgment on a malicious prosecution claim based on the absence of direct proof of actual malice is generally inappropriate where, as here, there are disputes of material fact regarding the existence of probable cause.  *E.g.*, *Ricciuti*, 124 F.3d at 130; *Lowth*, 82 F.3d at 573; *Douglas*, 595 F. Supp. 2d at 342; *Ramos*, 285 A.D.2d at 300-301.

Thus, in this action there are outstanding disputes of material fact as to: (i) whether the facts undermining the veracity of Qiana Beltran's allegations, which Detective Wasson was aware of before he arrested Mr. Angevin, were objectively sufficient to eliminate probable cause; (ii) whether the evidence of Detective Wasson's failure to inform ADA Katchen of those facts was purposefully misleading conduct that is sufficient to rebut the presumption of probable cause arising from the grand jury's indictment; and (iii) whether Detective Wasson acted with actual malice.  Courts have consistently denied motions to dismiss malicious prosecution claims based on analogous fact disputes. *Castrinacci v. Kirsopp*, 2012 WL 1801733, *12 (N.D.N.Y. May 16, 2012) (denying summary judgment on malicious prosecution claim where jury could find officer's failure to tell ADA about evidence indicating key eyewitness lied when inculpating plaintiff was sufficient to rebut presumption of probable cause); *Richards v. City of New York*, 2003 WL 21036365, *17 (S.D.N.Y. May 7, 2003) (denying summary where jury could find probable cause presumption was rebutted based on evidence that officers purposely withheld from ADA the fact that key eyewitness made inconsistent statements about plaintiff's involvement in crime); *also Ramos*, 285 A.D.2d at 298-301 (denying summary judgment where jury could find City agency's withholding of report from District Attorney showing rape victim's symptoms were inconsistent with her allegations was sufficient to rebut probable cause presumption and deem agency initiator of proceeding).  Accordingly, defendant's motion for summary judgment on the malicious prosecution claim should be denied.

## POINT III

## DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT
## FOR DETECTIVE WASSON ON QUALIFIED IMMUNITY GROUNDS

"Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks omitted); *also Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). Defendants assert that Detective Wasson is entitled to summary judgment on qualified immunity grounds with respect to the false arrest and malicious prosecution claims. More specifically, they contend that summary judgment is proper under the second prong of the qualified immunity test because there was "arguable" probable cause to believe Mr. Angevin committed a crime or that reasonable officers could disagree about the existence of such probable cause.[5] Defs.' Mem. at 16-17.

A.    There are Genuine Disputes of Material Fact That Preclude a Finding That Detective
      Wasson's Conduct Was Objectively Reasonable

The right to be free from arrest or prosecution without probable cause was clearly established before Mr. Angevin was arrested. *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."). Therefore, as defendants recognize, qualified immunity for Detective Wasson, if any, will rest on the second prong of the applicable test. Under this prong, summary judgment is proper for a police officer defendant on qualified immunity grounds when:

---

[5] Defendants appear to argue that the "'arguable' probable cause" test discussed in *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) somehow expands the breadth of qualified immunity for an arresting police officer. Defs.' Mem. at 16. It does not. The "arguable probable cause" test simply accounts for the fact that in the context of a false arrest claim the qualified immunity test must incorporate the standard for probable cause which is also a test of objective reasonableness. *Cerrone v. Brown*, 246 F.3d 194, 202-203 (2d Cir. 2001). The "arguable probable cause" test has thus been described as whether "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Id.* at 202-203 (internal quotation marks omitted). Nevertheless, the ultimate issue remains the same: "whether it was objectively reasonable for the officer[] to believe [he] did have probable cause." *Zellner*, 494 F.3d at 369; *also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

23

no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the [officer] to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (internal quotation marks omitted).  For purposes of this analysis, an officer's conduct is "objectively unreasonable" when "no officer of reasonable competence would have made the same choice in similar circumstances." *Green v. City of New York*, 465 F.3d 65, 83 (2006) (internal quotation marks omitted).  Summary judgment should not be granted on qualified immunity grounds where the material facts of a claim are in dispute and those facts bear on the question of whether the defendants' conduct was objectively reasonable.  *E.g.*, *Jenkins*, 478 F.3d at 88-90; *Green*, 465 F.3d at 83; *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2003).  Such disputes of fact abound here.

In relation to Mr. Angevin's false arrest claim, there is a dispute of fact as to whether the facts undermining the veracity of Qiana's allegations, which Detective Wasson knew of before he arrested Mr. Angevin, were objectively sufficient to eliminate probable cause.  Point I, *supra*.  Viewing the evidence in the light most favorable to Mr. Angevin, a jury could find that the discrepancies between Qiana's statements that the Detective knew of before the arrest sufficiently undermined her credibility to dispel any probable cause he had for the arrest.  On these facts, rational jurors could conclude that it was objectively unreasonable for the Detective to have believed that he had probable cause for the arrest.  Invoking the applicable definition of objective unreasonableness, a jury could find that "no officer of reasonable competence would have made the same choice [to arrest Mr. Angevin] in similar circumstances." *Green*, 465 F.3d at 83.

The situation is likewise with respect to the malicious prosecution claim.  Viewing the evidence in the light most favorable to Mr. Angevin and drawing all reasonable inferences in his favor, a jury could find that Detective Wasson purposely withheld the facts he knew that undermined the credibility of Qiana's allegations from ADA Katchen and that this conduct is sufficient to rebut the probable cause presumption arising from the grand jury indictment.  A jury could further infer actual malice from Detective Wasson's purposeful withholding of the information.  Based on these findings, a rational juror

24

could also conclude that it was objectively unreasonable for Detective Wasson to have believed that his

purposeful withholding from the ADA of the facts he knew that invalidated his conclusion on probable

cause did not violate Mr. Angevin's right to be free from a prosecution initiated maliciously and without

probable cause.  Again, applying the appropriate definition of objective unreasonableness, a rational juror

could find that "no officer of reasonable competence would have made the same choice [to purposely

withhold such information] in similar circumstances." *Green*, 465 F.3d at 83.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment should be denied.

Dated:  Brooklyn, New York
        September 28, 2012

                              LEVENTHAL & KLEIN, LLP
                              45 Main Street, Suite 230
                              Brooklyn, New York 11201
                              (718) 722-4100

                              By:   _____
                                    BRETT H. KLEIN (BK4744)

                              Attorneys for Plaintiff ADRIAN ANGEVIN