UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ADRIAN ANGEVIN,

Plaintiff,

–against–

CITY OF NEW YORK, WILLIAM WASSON,
and JOHN and JANE DOE 1 through 10,
individually and in their official capacities,

Defendants.

-----------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 0 6 2016 ★

BROOKLYN OFFICE

**MEMORANDUM AND ORDER**

10-CV-5327 (SLT)(SMG)

**TOWNES, United States District Judge:**

Plaintiff Adrian Angevin ("Plaintiff"), who was arrested by New York City Police

Department Detective William Wasson in mid-November 2009 and jailed for over 50 days

before the Supreme Court of the State of New York dismissed the charges against him, brings

this civil rights action against the City of New York and Wasson, alleging false arrest/false

imprisonment, malicious prosecution, and several other federal and state-law claims. The City

of New York and Wasson (collectively, "Defendants") now move for summary judgment,

arguing, *inter alia*, that Wasson had probable cause to arrest Plaintiff and that Plaintiff cannot

prove the malicious prosecution claim or any of the other federal claims alleged in Plaintiff's

complaint. For the reasons set forth below, Defendants' motion for summary judgment is

granted with respect to all of the federal claims and the Court declines to exercise supplemental

jurisdiction with respect to Plaintiff's state-law claims.

### *BACKGROUND*

The following facts are drawn either from the parties' statements pursuant to Local Civil

Rule 56.1 or from exhibits submitted by Plaintiff and are not in dispute. About 9:05 on the

evening of May 19, 2009, while on uniform patrol in a marked police cruiser, New York City

Police Officer Nayron Garcia received a radio call of a crime in progress at the Staten Island

Mall (Garcia: 23-26).[1]  He and his partner responded to that location, where they were flagged

down by two individuals: a teenaged girl and her mother (Garcia: 26-27).  Garcia ascertained

that the girl—a 16-year-old who is hereafter referred to as Q.B.—was the complainant and took

a statement from her (Garcia: 28).  Garcia subsequently incorporated that statement into a

Criminal Complaint (also known as a "UF-61"), a copy of which is attached as Exhibit B to the

Declaration of Matthew Weir in Support of the Defendant's Motion for Summary Judgment (the

"Weir Declaration") and as Exhibit 2 to the Declaration of Brett H. Klein in Opposition to

Defendants' Motion for Summary Judgment (the "Klein Declaration ").

According to the Criminal Complaint, Q.B. reported that she had been followed by an

unknown black man in the parking lot of the Staten Island Mall (Defendants' Statement of

Undisputed Facts pursuant to Local Civil Rule 56.1 ("56.1 Statement"), ¶¶ 2-3; Plaintiff's

Response to Defendants' Statement of Undisputed Facts pursuant to Local Rule 56.1 ("56.1

Response"), ¶¶ 2-3; Weir Declaration, Ex. B, p. 1; Klein Declaration, Ex. 2, p. 1).  Q.B. claimed

that the man was screaming at her for some unknown reason, causing her to fear for her safety

(56.1 Statement, ¶ 2; 56.1 Response, ¶ 2; Weir Declaration, Ex. B, p. 1; Klein Declaration, Ex. 2,

p. 1).  However, the Criminal Complaint did not indicate that the man had used force on Q.B.,

and classified the man's actions as harassment in the second degree, a violation (Weir

Declaration, Ex. B, p. 1; Klein Declaration, Ex. 2, p. 1).

---

[1]Numbers preceded by "Garcia" denote pages in the transcript of Garcia's February 23, 2012, deposition, a copy of which is attached as Exhibit 1 to the Declaration of Brett H. Klein in Opposition to Defendants' Motion for Summary Judgment.

On November 15, 2009, Wasson—a detective at the Staten Island Special Victims Unit—received a call relating to Q.B. (56.1 Statement, ¶ 4; 56.1 Response, ¶ 4). According to a Complaint Follow-up Informational Report (or "DD-5") prepared by Wasson on November 16, 2009—a copy of which is attached as Exhibit 4 to the Klein Declaration and as the first of six DD-5s included in Exhibit C to the Weir Declaration—the caller stated that Q.B. had seen the man who was the subject of her May 19, 2009, complaint. The caller alleged, for the first time, that the man had attempted to rape Q.B. (Weir Declaration, Ex. C, p. 1; Klein Declaration, Ex. 4).

Wasson, accompanied by a Detective Silverman, interviewed Q.B. in person later that same day (56.1 Statement, ¶ 5; 56.1 Response, ¶ 5). Q.B. told the detectives that on May 19, 2009, while walking through the parking lot at the Staten Island Mall, she had been approached by a man who threw a coat over her head, grabbed her, and said he wanted to "fuck her" (*Id.*; Weir Declaration, Ex. C, p. 2; Klein Declaration, Ex. 5). Q.B. claimed that she was able to "fight off" the man and flee (*Id.*). Q.B. further claimed that she recognized the man as someone with whom she had ridden the bus on several prior occasions (56.1 Statement, ¶ 6; 56.1 Response, ¶ 6).

Immediately after speaking with Q.B., Wasson interviewed Q.B.'s mother (56.1 Statement, ¶ 7; 56.1 Response, ¶ 7). According to a DD-5 Wasson prepared following that interview—a copy of which appears as Exhibit 7 to the Klein Declaration and as the third of the six DD-5s included in Exhibit C to the Weir Declaration—the mother recalled that Q.B. had pointed out the perpetrator on a prior occasion, while Q.B. and her mother were walking

together. The mother then followed the perpetrator to his place of employment (56.1 Statement, ¶ 7; 56.1 Response, ¶ 7; Weir Declaration, Ex. C, p. 3; Klein Declaration, Ex. 7).

The next day, Wasson and another detective visited the place of employment: an assisted living home for the elderly (56.1 Statement, ¶¶ 8, 13; 56.1 Response, ¶¶ 8, 13; Weir Declaration, Ex. C, p. 4; Klein Declaration, Ex. 8). There, Wasson spoke to a manager who deduced that the detectives were looking for Plaintiff, then telephoned Plaintiff to tell him that the police were asking for him (Weir Declaration, Ex. C, p. 4; Klein Declaration, Ex. 8). Plaintiff arranged to meet the detectives at his residence in Staten Island (56.1 Response, ¶ 9; Weir Declaration, Ex. C, p. 4; Klein Declaration, Ex. 8). The detectives then drove to the residence and spoke to Plaintiff, who agreed to meet with the detectives at their office (56.1 Statement, ¶ 9; 56.1 Response, ¶ 9; Weir Declaration, Ex. C, p. 4; Klein Declaration, Ex. 8).

During the meeting at the stationhouse on November 16, 2009, Plaintiff corroborated a portion of Q.B.'s story by confirming that he typically took the same bus as Q.B. to return home from work (56.1 Statement, ¶ 10; 56.1 Response, ¶ 10). Indeed, according to a DD-5 which Wasson prepared following his interview of Plaintiff—a copy of which is attached as Exhibit 9 to the Klein Declaration and as the fifth of the six DD-5s included in Exhibit C to the Weir Declaration—Plaintiff implied that he was familiar with Q.B., referring to her as "the girl from the bus with the bug eyes" who was "always staring at him." The police then placed Plaintiff's picture in a photo array and showed it to Q.B., who positively identified Plaintiff as the perpetrator (56.1 Statement, ¶ 11; 56.1 Response, ¶ 11). Wasson then arrested Plaintiff (56.1 Statement, ¶ 12; 56.1 Response, ¶ 12).

4

At his February 22, 2012, deposition—the transcript of which is attached to the Klein Declaration as Exhibit 3—Wasson admitted that he had obtained a copy of the Criminal Complaint prior to the arrest (Wasson: 57, 60-61).[2] He was aware that the statements attributed to Q.B. in that document only made out harassment and did not mention the physical assault and the lewd comment which Q.B. had described to Wasson (Wasson: 62). However, Q.B. claimed to have told both the 911 operator and Officer Garcia about the assault and the comment, telling Wasson that her prior statements to the police had not been accurately recorded (Wasson: 114-15). Q.B.'s mother corroborated Q.B.'s claims to some degree, confirming that Q.B. had made a prior complaint and that she had not followed up on that complaint on the assumption that detectives would "reach out" to Q.B. (Wasson: 48).

Wasson found Q.B. and her mother to be credible (Wasson: 63). Accordingly, he did not obtain a recording of Q.B.'s May 19, 2009, call to 911 or a copy of the Sprint report of that call (Wasson: 78-79). He also did not "feel it was necessary" to contact Garcia or anyone else with knowledge of the Criminal Complaint (Wasson: 61). As Wasson explained at his deposition, "information ... gets lost transmitting on the [UF-]61s all the time" (Wasson: 78), for a number of reasons:

> It could have been an error in communication between her and the officer. It could have been she was hysterical. She left something out. It could have been anything (Wasson: 98).

---

[2]Numbers preceded by "Wasson" denote pages in the transcript of Wasson's February 22, 2012, deposition.

In addition, Wasson testified that he had had "numerous cases where additional information would come up months later" making him aware that "information comes up later on in a sex crime case that doesn't come out originally" (Wasson: 45, 122).

Wasson also beleived that he "didn't have the time" to conduct a further investigation before arresting Plaintiff (Wasson: 116). During his investigation, Wasson learned that Plaintiff lived close to Q.B.'s high school, worked the night shift at an assisted living facility near Plaintiff's home, and commuted from work on the bus around the same time that Q.B. would be taking that same bus to school (Wasson: 75-76). Aware that Q.B. had seen Plaintiff several times after the May 19, 2009, incident, Wasson "felt the necessity to make an arrest" before attempting to obtain further information regarding the 911 call (Wasson: 115-16). Wasson also "felt that there was an urgency to make an arrest" because Plaintiff "worked with elderly people overnight at a health care facility" (Wasson: 66).

On November 17, 2009—the day after Plaintiff's arrest—Plaintiff appeared in a lineup and was again positively identified as the perpetrator by Q.B. (56.1 Statement, ¶ 11; 56.1 Response, ¶ 11). That same day, a grand jury indicted Plaintiff of attempted rape in the first degree, attempted kidnaping in the second degree, stalking in the third degree, and endangering the welfare of a child (56.1 Statement, ¶ 14; 56.1 Response, ¶ 14). Plaintiff was arraigned on those charges on November 18, 2009, before the Honorable Leonard P. Rienzi, who set bail in the amount of $250,000 (Klein Declaration, Ex. 15). Plaintiff posted bond on January 7, 2010, after spending over 50 days in jail (*Id.*).

On April 28, 2010, Assistant District Attorney Anthony L. Katchen filed a Recommendation for Dismissal in the Supreme Court of the State of New York, Richmond

6

County (56.1 Statement, ¶ 15; 56.1 Response, ¶ 15). That document, a copy of which is attached to the Weir Declaration as Exhibit F and to the Klein Declaration as Exhibit 14, sets forth several inconsistencies in Q.B.'s accounts. One of the inconsistencies was the fact that Q.B. claimed to have told Garcia that she was physically assaulted, even though Garcia's report failed to record any use of force (Recommendation of Dismissal, ¶ 14). The other inconsistencies were discovered during the course of the District Attorney's investigation of the incident. These included the fact that high school records indicated that Q.B.—who claimed to have seen Plaintiff regularly on her morning bus ride to school and at the bus stop near her school in the afternoon—had not attended the school since November 14, 2008 (*Id.*, ¶¶ 13, 16). When confronted with these inconsistencies, Q.B. not only failed to provide a plausible explanation for the contradictions between her story and documentary evidence, but cast further doubt on her credibility by making demonstrably false claims about a mathematics grade (*Id.*, ¶ 19). Recognizing that his case relied on Q.B.'s credibility, ADA Katchen concluded that, although there had been probable cause for Plaintiff's arrest and subsequent indictment, the People would be unable to prove any of the charges in the indictment beyond a reasonable doubt (*Id.*, ¶ 22).

***This Action***

In mid-November 2010, less than seven months after the indictment was dismissed, Plaintiff commenced this civil rights action against the City of New York, Wasson and ten Doe defendants. Plaintiff's complaint alleges facts which are largely identical to those set forth above, then raises 16 causes of action. The first eight of these allege liability under 42 U.S.C. § 1983, while the remaining eight allege state-law claims. For purposes of this memorandum and order, the Court need only describe the first eight causes of action.

7

The first four causes of action allege that Defendants violated Plaintiff's constitutional rights in various respects. The first cause of action alleges that Defendants, by perpetrating the acts alleged in the Complaint, violated Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution. The second cause of action alleges false arrest and unlawful imprisonment, asserting that Defendants arrested Plaintiff without probable cause or caused him to be falsely arrested and unlawfully imprisoned. The third cause of action alleges malicious prosecution, claiming that Defendants initiated, commenced, continued, or caused Plaintiff to be prosecuted without probable cause. The fourth cause of action alleges that the Defendants violated Plaintiff's right to be free from "malicious abuse of process" by causing Plaintiff to be prosecuted "in order to obtain a collateral objective outside the legitimate ends of the legal process, to wit: to cover up their abuse of authority ..." Complaint, ¶ 44.

The fifth cause of action alleges that "[t]he defendants" failed to intervene in order to prevent "other officers" from violating Plaintiff's constitutional rights in their presence (*Id.*, ¶¶ 46-47). However, the Complaint does not specify the defendants against whom this cause of action is brought or the "officers" who violated Plaintiff's rights. The pleading also does not specify the manner in which Plaintiff's rights were violated, stating only that the defendants "failed to intervene to prevent the unlawful conduct described herein" (*Id.*, ¶ 47).

The sixth cause of action alleges a violation of substantive due process, asserting that "[t]he defendants['] conduct herein was an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment" (*Id.*, ¶ 50). The seventh cause of action alleges supervisory liability, positing that "individual defendants personally caused plaintiff's constitutional injury by being deliberately or consciously

indifferent to the rights of others in failing to properly supervise and train their subordinate employees" (*Id.*, ¶ 53). The Complaint does not specifically identify the "individual defendants" or the "subordinate employees."

The eighth cause of action attempts to state a claim for municipal liability. It alleges that two "customs, policies, usages, practices, procedures and rules" of the New York City Police Department resulted in the violation of Plaintiff's constitutional rights. First, the pleading alleges a custom or policy of "arresting individuals without an adequate investigation and then withholding or otherwise failing to bring exculpatory evidence to the attention of prosecutors or the grand jury ..." (*Id.*, ¶ 56). Second, the Complaint charges the City with engaging "in a policy, custom or practice of inadequate screening, hiring, retaining, training, promoting, compensating and supervising its employees," asserting that this was a "moving force" behind the violation of Plaintiff's rights (*Id.*).

### *The Instant Motion for Summary Judgment*

Defendants now move for summary judgment with respect to all eight federal causes of action. With respect to the first two causes of action, defendants argue that Wasson had probable cause to arrest Plaintiff on the evening of November 16, 2009. With respect to the third cause of action, defendants argue that Plaintiff cannot make out three of the four elements of a malicious prosecution claim. Defendants also assert that Plaintiff has failed to establish malicious abuse of process set forth in the fourth cause of action because he has failed to show that Wasson used legal process for a purpose other than the purpose for which it was created.

With respect to Plaintiffs' fifth and seventh causes of action, Defendants assert that there is no factual basis for either a failure to intervene or a supervisory liability claim. Defendants

note that Wasson is the only individual defendant currently named in the case, and that Plaintiff has not established that he was supervising others or aware that those others were involved in any violations of Plaintiff's constitutional rights. Defendants also argue that, even if Wasson had violated Plaintiff's federally protected rights, Wasson would be entitled to qualified immunity.

Defendants seek to dismiss the substantive due process claim alleged in Plaintiff's sixth cause of action, alleging that Wasson's actions were not "clearly unjustified by any legitimate objective of law enforcement" (Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defendants' Memo"), p. 14). In addition, Defendants contend that the eighth cause of action should be dismissed because Plaintiff cannot show that a municipal policy or practice resulted in the deprivation of Plaintiff's constitutional rights. Finally, Defendants seek to dismiss the state-law claims on the merits. However, Defendants also argue, in the alternative, that the Court should decline to exercise supplemental jurisdiction over these claims.

In his Memorandum of Law in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition"), Plaintiff addresses only three of the arguments raised by Defendants. First, Plaintiff opposes summary judgment on the false arrest claims, arguing that because Wasson was aware of facts that undermined Q.B.'s credibility before he arrested Plaintiff, there exists a genuine issue of material fact regarding whether there was probable cause for the arrest. Second, Plaintiff opposes summary judgment on the malicious prosecution claims, arguing that there are undisputed facts showing that Wasson

failed to inform ADA Katchen about Q.B.'s prior inconsistent statements to Garcia. Plaintiff asserts that Wasson's omissions constitute "bad faith conduct" which not only supports a finding that Wasson initiated the criminal proceeding and provides a basis for finding actual malice, but also is sufficient to rebut the presumption of probable cause that arises from the grand jury indictment. Third, Plaintiff argues that the Court should not grant Wasson qualified immunity because there are genuine issues of material fact that preclude a finding that Wasson's conduct was objectively reasonable.

***DISCUSSION***

### I. Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation omitted; brackets added).

Initially, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must then "set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and brackets omitted). Moreover, a party cannot sustain its burden in opposing summary judgment by relying on inadmissible hearsay evidence. *See G.I. Home Developing Corp. v. Weis*, No. 499 F. App'x 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in his favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and brackets omitted).

## *II. False Arrest/False Imprisonment*

"The common law tort of false arrest is a species of false imprisonment." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Under New York law, the elements of a false arrest or false imprisonment case are the same: a plaintiff must show "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise

privileged." *Id.*; *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause ... is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

"The existence of probable cause gives an officer the privilege to arrest ...." *Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996) (quoting *Bernard*, 25 F.3d at 102). Accordingly, "the existence of probable cause is 'a complete defense to [a civil rights action arising from an arrest],' whether brought under state law or Section 1983." *Daniels v. D'Aurizo*, 564 F. Supp. 2d 194, 197 (W.D.N.Y. 2008) (quoting *Bernard*, 25 F.3d at 102 (brackets added in *Daniels*)). Summary judgment dismissing a plaintiff's false arrest or false imprisonment claim is, therefore, "appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007).

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852; *see Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). "[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) (internal quotations omitted). Generally, "[o]nce a police officer has a

reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

The Second Circuit has described the process for determining whether probable cause exists as follows:

> [C]ourts must consider those facts available to the officer at the time of the arrest and immediately before it, ... as probable cause does not require absolute certainty. Courts should look to the totality of the circumstances and must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Nevertheless, an officer may not disregard plainly exculpatory evidence.

*Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations, brackets, emphasis, and citations omitted); *see Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012). A victim's identification of an assailant is, by itself, sufficient "probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119.

In this case, the undisputed evidence establishes that Wasson conducted an in-person interview with Q.B., who reported facts sufficient to cause a person of reasonable caution to believe that Plaintiff had assaulted her and attempted to rape her. Specifically, Q.B. told the detective that on May 19, 2009, a man had physically assaulted her in the parking lot of the Staten Island Mall and stated that he wanted to "fuck her." Q.B. then identified Plaintiff from a photo array, giving Wasson probable cause to arrest Plaintiff.

14

Wasson was not in possession of any information that tended to exculpate Plaintiff. To the contrary, Wasson's investigation uncovered evidence that Q.B. was accurate in her identification of Plaintiff. Q.B. claimed that she recognized her assailant as someone with whom she had ridden the bus on several prior occasions. Wasson ascertained that Plaintiff not only worked near Plaintiff's home and lived near Q.B.'s school, but worked a night shift and traveled home on the same bus that Plaintiff took to school. When interviewed, Plaintiff confirmed that he was familiar with Q.B., referring to her as "the girl from the bus with the bug eyes" who was "always staring at him." See Klein Declaration, Ex. 9; Weir Declaration, Ex. C, p. 5.

To be sure, the description of the May 19, 2009, incident which Q.B. gave to Wasson differed from the description recorded by Officer Garcia. However, Q.B. claimed to have told both the 911 operator and Garcia about the assault and claimed that the Criminal Complaint did not accurately reflect what she had said. Q.B.'s claim was corroborated to some degree by Q.B.'s mother, who was present when Garcia interviewed Q.B. Wasson found Q.B. and her mother to be entirely credible, noting that "information ... gets lost transmitting on the [UF-]61s all the time" (Wasson: 78).

Wasson was also aware that even if he obtained evidence from Garcia and the 911 record which contradicted Q.B.'s claim that she had mentioned the assault and the lewd comment on May 19, 2009, this inconsistency would not mandate the conclusion that Q.B. was untruthful. As Wasson pointed out, there were other plausible explanations:

> It could have been an error in communication between her and the officer. It could have been she was hysterical. She left something out. It could have been anything (Wasson: 98).

In addition, Wasson, an experienced detective who recalled "numerous cases where additional information would come up months later," was aware that "information comes up later on in a sex crime case that doesn't come out originally" (Wasson: 45, 122).

Furthermore, Wasson had information militating against delaying the arrest in order to conduct a more extensive investigation. Through his investigation, Wasson learned that Plaintiff worked the night shift at an assisted living facility near Plaintiff's home and that Q.B. had seen Plaintiff several times after the May 19, 2009, incident. Wasson not only "felt the necessity" to make an immediate arrest to protect the minor Q.B., but also "felt that there was an urgency to make an arrest" because Plaintiff was working "with elderly people overnight at a health care facility" (Wasson: 66, 115-16).

### III. *Malicious Prosecution*

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment ... and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted). "Under New York law, '[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice.'" *Savino*, 331 F.3d at 72 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 (N.Y. 1983)). To show a violation of the plaintiff's Fourth Amendment rights, a plaintiff must establish a fifth element: "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y. City Transit Auth.* (NYCTA), 215 F.3d 208, 215 (2d Cir. 2000).

Defendants argue that Plaintiff cannot make out the first, third, and fourth elements of a malicious prosecution claim. The Court agrees. Although the failure to make out any one element would be fatal to Plaintiff's malicious prosecution claim, the Court will address each of the three elements.

## A. *Initiation*

The term "initiation," as used in the first element, "s a term of art." *Id.* In order to establish that a defendant "initiated" a prosecution for these purposes, a plaintiff must show that the defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* It is well settled that a defendant does not "initiate" a prosecution by merely reporting a crime to police and subsequently giving testimony. *Id.* Similarly, "an officer who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Husbands ex rel. Forde v. City of New York*, No. 05 Civ. 9252 (NRB), 2007 WL 2454106, at *9 (S.D.N.Y. Aug. 16, 2007) (internal quotations omitted), *aff'd*, 335 F. App'x 124 (2d Cir. 2009) (summary order).

In this case, Plaintiff has not adduced proof that Wasson played an active role in the prosecution. To be sure, Wasson conducted the initial investigation and made the decision to arrest Plaintiff, then met with the prosecutor on November 16, 2009, to discuss his interviews of Q.B. and her mother. Wasson testified, however, that he had no interactions with the District Attorney's Office regarding the case after the arrest other than possibly testifying before the grand jury (Wasson: 88). Even assuming that Wasson testified before the grand jury, despite the fact that he did not remember having done so (Wasson: 87), that testimony must have occurred sometime before the grand jury voted to indict Plaintiff on November 17, 2009. There is no

17

evidence that Wasson had any further involvement in the case after that date. Since there is nothing to suggest that Wasson did more than disclose to the prosecutor the material information within his knowledge, there is insufficient evidence to establish that Wasson initiated the criminal proceedings against Plaintiff. *See Husbands ex rel. Forde*, 2007 WL 2454106, at *9.

### B. Probable Cause

With respect to the third element, the conclusion that Wasson had probable cause to arrest Plaintiff is not dispositive. While "probable cause to arrest is generally construed as probable cause to prosecute as well," *Kilburn v. Vill. of Saranac Lake*, 413 F. App'x 362, 364 (2d Cir. 2011) (summary order), the third element requires proof that the defendant lacked probable cause to believe that the plaintiff could be successfully prosecuted. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). "[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). However, [i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Id.*

In this case, there is nothing to suggest that Wasson discovered any evidence subsequent to the arrest, much less evidence which would cause probable cause to dissipate. Indeed, as discussed above, the evidence suggests that Wasson had no involvement with the case after mid-November 2009. Wasson never even obtained a copy of the Sprint report or spoke to Garcia to determine whether Q.B.'s account of the incident was accurately reflected in the Criminal Complaint. Rather, it was the prosecutor, ADA Katchen, who conducted the post-arrest

investigation which discovered additional inconsistencies that led the prosecution to question Q.B.'s veracity.

In addition, as acknowledged in Plaintiff's Opposition, a grand jury indictment creates a presumption of the existence of probable cause to prosecute. *See* Plaintiff's Opposition, pp. 19-20 )(citing *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). "The presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts ... that they have misrepresented or falsified evidence ... or otherwise acted in bad faith.'" *Boyd*, 336 F.3d at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

In this case, there is no evidence of bad faith sufficient to overcome the presumption. Although Plaintiff asserts that the "undisputed evidence" establishes that Wasson never informed the prosecutor that Q.B.'s allegations of attempted rape were inconsistent with the account of the incident which Plaintiff gave to Garcia, there is ample evidence that the prosecutor was aware of the inconsistency. At his deposition, Wasson could no longer recall whether he "affirmatively brought up the discrepancy" with ADA Katchen, but testified that the discrepancy "was definitely brought up" during his meeting with the prosecutor (Wasson: 95). Wasson further testified that ADA Katchen indicated that he was going to talk to Garcia to determine why there were inconsistencies between the Criminal Complaint's description of the incident and Q.B.'s subsequent accounts (Wasson: 91-92).

### C. Malice

To make out "malice" for purposes of the fourth element, a plaintiff must show "that the defendant ... commenced the criminal proceeding due to a wrong or improper motive, something

other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573 (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03, 406 N.Y.S.2d 443, 445 (N.Y. 1978)). A "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997). "Conversely, the existence of probable cause on these facts precludes a finding of malice, as there is no 'improper motive' in following through on the prosecution of a defendant lawfully arrested." *Husbands*, 2007 WL 2454106, at *9.

There is no evidence that Wasson had "a wrong or improper motive" for arresting plaintiff or was motivated by "something other than a desire to see the ends of justice served." *See Lowth*, 82 F.3d at 573. To be sure, Wasson admitted that members of his unit consider it a "big deal" to make a rape arrest (Wasson: 34). However, as noted above, there was also evidence that Wasson had probable cause to arrest plaintiff and "there is no 'improper motive' in following through on the prosecution of a defendant lawfully arrested." *See Husbands*, 2007 WL 2454106, at *9.

## IV. *Qualified Immunity*

The threshold question to consider when a defendant officer charged with violations of federal constitutional rights invokes qualified immunity to support a motion for summary judgment is whether "the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). If "there is no viable constitutional claim, defendants have no need of an immunity shield," and "there is no necessity for further inquiries concerning qualified immunity." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Since the Court has already concluded that

Wasson had probable cause to arrest Plaintiff on the evening of November 16, 2009, and that

Plaintiff has not made out a malicious prosecution claim, there is no need to address the issue of

whether Wasson is entitled to qualified immunity.

This Court nonetheless notes that, even if reasonable minds could differ as to whether

Wasson had probable cause to arrest Plaintiff or to initiate a prosecution, Wasson would be

entitled to qualified immunity. "Qualified immunity is designed to protect officers making

'split-second judgments ... in circumstances that are tense, uncertain, and rapidly evolving.'"

*Marchand v. Simonson*, 16 F. Supp. 3d 97, 114 (D. Conn. 2014) (quoting *Saucier*, 533 U.S. at

205). Thus, an arresting officer is "entitled to qualified immunity from a suit for damages if he

can establish that there was 'arguable probable cause' ...." *Escalera v. Lunn*, 361 F.3d 737, 743

(2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for

the officer to believe that probable cause existed, or (b) officers of reasonable competence could

disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New

Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

In order to find that Wasson is not entitled to qualified immunity in this case, the Court

would essentially have to find that, even upon being told by a named complainant that a specific

individual attempted a rape, no reasonable police officer could immediately arrest that

individual or initiate a prosecution for attempted rape if the complainant's prior statement to

police omitted any mention of a physical assault. The Court rejects this argument. After all,

cases in which a complainant fails to immediately report a sex crime are not only prosecuted, but

frequently go to trial, as evidenced by the fact that New York's pattern jury instructions contain

a charge regarding the factors a jury should consider in assessing the complainant's credibility

in light of a failure to make a prompt outcry. *See* http://www.nycourts.gov/judges/cji/ 1-General/CJI2d.Prompt_Outcry. Moreover, as noted in those pattern jury instructions, evidence that a complainant failed to make a prompt outcry does not compel the conclusion that the complainant is incredible. *See id.* A jury may find a delay in reporting a sex crime to be entirely reasonable in light of such factors as the complainant's age, past experiences, mental state, and fear of the perpetrator. *See id.*

It is the role of the jury, not an arresting officer, to engage in these sorts of credibility determinations. "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause*, 887 F.2d at 372. Moreover, given that the "function of the local police [is] to protect the community's safety," *South Dakota v. Opperman*, 428 U.S. 364, 374 (1976) (brackets added), the fact that a complainant failed to mention a sex crime during her prior descriptions of the incident should not preclude a reasonable officer from making an immediate arrest where there is evidence that the alleged perpetrator is in regular contact with the complainant or a vulnerable population.

## V. *The Remaining Federal Causes of Action*

Plaintiff has not made any effort to controvert Defendants' arguments pertaining to the remaining federal causes of action. With respect to Plaintiff's fourth cause of action, alleging malicious abuse of process, Plaintiff has not adduced facts to show that Wasson used legal process for a purpose other than the purpose for which it was created. With respect to the fifth and seventh causes of action, alleging failure to intervene and supervisory liability, Plaintiff has

22

not named or served any individual defendants other than Wasson. With respect to the sixth

cause of action, alleging violations of substantive due process, Plaintiff has not established that

Wasson engaged in the kind of heinous behavior recognized in the law as "conscience-

shocking." *See Cusick v. City of New Haven*, 145 F. App'x 701, 703 (2d Cir. 2005) (summary

order). Finally, with respect to the eighth cause of action, Plaintiff has not provided any

evidence of a municipal policy or practice that resulted in the deprivation of Plaintiff's

constitutional rights. Accordingly, the Court grants Defendants' motion for summary judgment

with respect to Plaintiff's fourth, fifth, sixth, seventh and eighth causes of action.

## VI. The State-Law Claims

A district court "may decline to exercise supplemental jurisdiction over a claim ... [if] ...

the district court has dismissed all claims over which it has original jurisdiction ..." 28 U.S.C.

§ 1367(c)(3). Although "[t]he exercise of supplemental jurisdiction is within the sound

discretion of the district court," *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106,

117 (2d Cir. 2013), the Second Circuit has repeatedly stated that "if a plaintiff's federal claims

are dismissed before trial, 'the state claims should be dismissed as well.'" *Brzak v. United*

*Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (quoting *Cave v. E. Meadow Union Free Sch.*

*Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)). This rule is consonant with the Supreme Court's

observation that when "all federal-law claims are eliminated before trial, the balance of factors to

be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness,

and comity—will point toward declining to exercise jurisdiction over the remaining state-law

claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

For the reasons stated above, the Court grants summary judgment to Defendants with respect to all eight federal causes of action alleged in Plaintiff's complaint. The remaining eight causes of action allege purely state-law claims. Since all federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over the ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and sixteenth causes of action in Plaintiff's complaint. *See Brzak*, 597 F.3d at 113-14.

## *CONCLUSION*

For the reason set forth above, Defendants' motion for summary judgment is granted with respect to the first eight causes of action listed in Plaintiff's complaint. The Court declines to exercise supplemental jurisdiction over the remaining eight causes of action, all of which allege state-law claims. The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

**SO ORDERED.**

/s/ *Sandra L. Townes*

/SANDRA L. TOWNES
United States District Judge

Dated: September   / , 2016
       Brooklyn, New York